Glock vs. Glock. Amazing inventor of the pistol. Still alive. Mr. Smith. Morning. Good morning. It's not the words of the law, but the internal sense of it that makes the law. The letter of the law is the body. The sense and reason of the law is the soul. Justin Harlan said that in 1883. In the court, this court recognized that truth. First, Justice Harlan. I tell you, you know, I've seen a lot of shotgun pleadings, but I've never seen one like this. This is got to be the most God awful, longest, most convoluted complaint I've ever seen filed in a federal court. I can start with the shotgun. 1800 paragraphs. Yes, sir. 546 pages. Yes, sir. Your Honor, the plaintiffs in this case had the obligation, not only with the pleading standard of plausibility with respect to Rico, which the standard that the court is held for Rico legally and often practically tends to be higher than the that of a regular cause of action. The astonishing thing is that this is, despite this level of detail and cross references and redundancies and everything that you don't want to see in a complaint, is that it appears to fail to satisfy those requirements. You know, the most fundamental of which, because it's a Rico complaint, the requirement of a domestic injury. I mean, I look at this at how Judge Thrash went through this carefully on numerous grounds. Shotgun pleading, failure to plead fraud with particularity, no domestic injury. And I'm at a loss to see where he was wrong about any of it. And all he had to do was be right about one of them. Your Honor, if I may. Veil piercing, standing, domestic injury, shotgun pleading. The complaint, we believe, adequately lays out the concept of veil piercing. And in Stooksbury, the Sixth Circuit recognized that when there is a concept of veil piercing, it is relevant when evaluating whether an injury is direct or indirect. In addition, Judge Thrash himself, in a prior case, in evaluating a complaint alleging Rico, in doing that, Judge Thrash also recognized that the allegation of veil piercing affected his analysis. How did it affect his analysis? He took it as true and determined that the enterprise was no longer distinct because the allegations were such. We've got an Austrian individual suing an Austrian individual and an Austrian company, which she's a 1% shareholder. And they live in Austria. And you've got to establish a domestic injury. And I don't see how that's present here. Well, to me, Your Honor, I think the domestic injury is clear. It's clear in this way. You've got a parent company in Austria. You've got a corporation in Georgia, Glockink. The connection of those two entities, there is a 100% shareholder at the beginning. And then 50% of the shares were, we allege, unlawfully removed in Georgia. And their client is not a shareholder of the American corporation. That is correct, Judge. She is not a shareholder of the American corporation. However, she alleged veil piercing of both corporations. And when a properly and adequately alleged veil piercing is present, then the court can look past those entities. And those entities are a nullity, leaving what is left. And what is left are the shareholders of the particular entities. And I would submit to the court that with respect to the veil piercing and with respect to Georgia law on veil piercing, it would permit Mrs. Glock to bring a direct claim against Mr. Glock and the other defendants for what happened. And we believe that is consistent with Bivens of the 11th Circuit. Why is it consistent with Bivens? Well, in Bivens, the court determined that a case could be brought as a derivative claim. In fact, Judge Thrash, in his opinion, suggested that Mrs. Glock bring a derivative action in Austria based on the parent company. Well, Bivens recognized that a derivative action would be permitted for RICO. Why? Because when you're looking at where the harm is directed at, Bivens determined that a shareholder can step into the shoes of a company where the shareholder alleges that there was a wrong directed and targeted at the company itself. That's what Bivens said. It was directed and targeted at the company, and the shareholder was seeking to redress damage or harm to the company. Well, in the context of a veil piercing, that is not possible because the allegations are that the entities themselves are a alter ego, and the entities themselves are a sham. So bringing a derivative action when you're concomitantly alleging that the entity should be pierced wouldn't make any sense. And I would submit to the court that if the court were to affirm Judge Thrash's decision and Mrs. Glock were to return somewhere with a claim of a derivative action, that that claim would be defeated because of her allegations of veil piercing. Because if the companies themselves are merely Mr. Glock's alter ego, he can't direct and target himself. And that's what was present in Bivens. What was present in Bivens was a claim that the defendants targeted and directed injury at the entity, which is what gave rise to permit a direct cause of action, a derivative action, and provided for standing. So under the concept of veil piercing, which we believe is adequately pled, that causes the court to be able to look and allow Mrs. Glock to bring a direct claim. And that direct claim is against a series of defendants. The complaint, albeit long, sets out the various predicates that we believe are here. It is not a typical shotgun pleading in as much as it doesn't incorporate all the prior allegations, all the prior cause of actions. It lays out which particular paragraphs and which particular claims are against which particular defendants and relate to which particular claims. And I would submit to the court that in an instance where the plaintiff is not only alleging a RICO cause of action, but is also alleging a cause of action to pierce the veil of the second largest gun manufacturer in the world, that a level of detail is necessary. As it relates to the court's question about domestic injury, how is this a domestic injury? Well, at the end of the day, what is the injury that Mrs. Glock has alleged? When the veils of the entities are pierced, Mrs. Glock has been here since 1985 as a business. Those entities are here. If the court accepts the veil-piercing allegations, which we believe it must, at this stage, in a motion to dismiss. Judge Thrash is concerned that you're trying to use veil-piercing to get around the direct injury requirement  What I would say to that, Judge, is that we don't believe the law supports that analysis. And we don't believe it supports it for this reason. It's not an indirect injury if the entities are a sham. If the entities are an alter ego of the defendant, it can't be indirect because the defendant can't target and direct injury at himself. That is precisely what the Sixth Circuit said in Stokesbury. The Sixth Circuit in Stokesbury said exactly that. What the Sixth Circuit said was that naming Teleco, the company, as a defendant would not make any sense because it can't be expected to sue itself. And so I would submit to the court that it's not getting around. If she had a derivative claim, it'd be a derivative claim on behalf of an Austrian entity. Well, Your Honor, because The waste would be with respect to the Austrian entity, which would be not a domestic injury. Well, the Austrian entity owns 50% of the shares of a Georgia-based entity. And when you have a parent and a subsidiary, and when you have veil-piercing as between those entities, then the veil between the sub and the parent also are disregarded and are deemed a nullity for the purpose of that evaluation. So what you have is an Austrian entity owning, in part, a Georgia entity. We've alleged veil-piercing of those entities. Now you have a direct claim by Mrs. Glock, a shareholder of one of the two entities, against her co- Austrian resident, a shareholder of an Austrian entity. It is an Austrian resident, Your Honor. And we would say that the Second Circuit, in its analysis in Bastianen, would say you look to where the property is. And we understand this is an issue of first impression in this circuit. We believe that the Second Circuit got it right. And the Second Circuit's analysis says you look where the property was injured. And in Bastianen, Your Honor, the plaintiff in that case was a person who was a Chilean resident, who inherited a fortune from his family, who at the time was sick in a hospital in Italy. There is not a single allegation in Bustanen, at least in the opinion, that Mr. Bustanen was ever in New York, ever stepped foot in New York, or ever had an account in New York. The accounts were set up through a power of attorney. And the allegation is that monies were stolen from those accounts as well as stocks being sold from a safety deposit box in New York. You say five minutes for rebuttal. Yes, sir. Good morning. John Floyd for the defendants. This court has repeatedly cautioned that particularly with regard to Civil RICO claims, plaintiffs must stop and think before filing them. That caution was ignored here. Ms. Glock reveals the true nature of her case when she says that because she and Mr. Glock jointly built the Glock empire, a portion of the proceeds of their joint efforts rightfully belongs to Helga. That is a measure of damages that has absolutely nothing to do with the Federal RICO statute's private civil damages remedy. It has everything to do with an Austrian divorce. And everything about this case has been an agonizing effort by Ms. Glock to shoehorn her Austrian divorce, not satisfied with 13 separate cases pending in Austria, into the American civil justice system and into a RICO claim. A person suing under RICO has to be injured in, in this case, her business or property. Ms. Glock was not injured in her business or property, and Judge Thrash properly held that she didn't have standing. For much of the same reason, she doesn't have a domestic injury, because it wasn't her property that was here. She also has the problem that not only did she not have property here, but she herself was always in Austria. There is no allegation that she's ever even been to the United States. There's no allegation that she ever directly owned anything in the United States. This is all an effort to tease out of her 15% ownership in the parent company, Glock G-E-S-M-B-H, a domestic cause of action and a domestic injury, and it's just not there. The Baskunin case, so heavily relied upon by Ms. Glock, does not say what counsel says it says. In Baskunin, there were four alleged injuries. Two were permitted to proceed by the Second Circuit. Both involved what the Second Circuit concluded was tangible property owned by the plaintiff, present in the United States at the time it was stolen. In one case, it was a discreet bank account in New York, which was looted by the defendant. In the other case, they were bearer bonds physically stored in a safe deposit box in the victim's name in New York, and those bearer bonds were physically removed. Ms. Glock has absolutely nothing analogous to that. She never owned a share of stock in Glock, Inc. She doesn't allege she was supposed to have owned a share in Glock, Inc. She alleges affirmatively that all the stock in Glock, Inc. should have stayed in the parent company in which she is a shareholder. Right. She doesn't let – Down to its essence, she's claiming that the parent company was looted by these transfers to the American company, right? But never claims that she owned any kind of interest in the American company, right? That is absolutely correct. In fact, she says, I didn't own it and I wasn't supposed to own it. Her theory is it was supposed to be somewhere else, not with her. Right. Nor does she claim she made a direct investment into Glock, Inc. She doesn't claim that she owned any asset of Glock, Inc., the buildings it was in. She had no right to dispose of those. She had no ownership interest. The inventory, the bank accounts, there's never an allegation that anything came out of a bank account of hers in the United States. Or anywhere else in the world. Okay. Every injury – she doesn't have standing because every injury is mediated by a corporate entity first. Nothing happens to her that doesn't happen to a corporation first. And that flies straight into the brick wall of – excuse me. I blanked on the name. Excuse me. This court standard of requiring a direct injury to the property or business of the plaintiff. And this is all a dance where we talk about the spirit of the law, et cetera. Well, the law is clear. The standard is clear. It's established by this court and the United States Supreme Court, and this plaintiff can't change it. Stokesbury doesn't change it. Stokesbury is an unpublished Sixth Circuit case that relies on Tennessee law for veil piercing. Georgia law is exactly the opposite. The Acri versus McMahon case precludes precisely the kind of veil piercing that the plaintiff relies on. And expressly says Georgia will not permit reverse veil piercing where it functions as a substitute for a fraudulent conveyance. It's exactly what we're talking about here. You move the assets out fraudulently. Now, we don't know that Georgia law would require that, would control. But if Georgia law controls, it's fatal. Otherwise, it's Austrian law and we've got no business dealing with this. Because at the end of the day, turning to foreign injury, Ms. Glock wasn't here. Her property wasn't here. But beyond that, if this court were tempted to go down the road of basically paying only lip service to RJR Nabisco, while undoing the fundamental premise of it by basically saying veil piercing is a magic wand, then what would you have to do under this complaint? You would first have to engage in veil piercing, which, by the way, doesn't do what the plaintiff says it does. Because we've got a V in the middle of these parties. And collapsing the corporate veil amongst defendants only gives you fewer defendants. It doesn't give her any ownership interest in any defendant. She's on her side of the V. It works vertically, but it accomplishes nothing horizontally. And therefore, her case fails. That's why she has the mystical unnamed partnership that appears in this case. Now, every other entity that shows up in this case is identified in meticulous detail. We have KGs. We have GESMBHs. We have private Stiftungen, adding to my vocabulary as a result of this case. We have LLCs around the world. We have bank tellers identified on specific transactions. But the partnership with no name just sails silently through these 546 pages of allegations. It doesn't have a name. It doesn't have a place. There's never an office. There's never a bank account, a piece of property identified. It doesn't have an address, a phone number. There's nothing to suggest any meeting ever took place. We don't know when it came into existence. How it came to acquire everything in the Glock Empire is absolutely nothing there. And this is just simple Twombly. Twombly, the original big daddy on the change of 8A application, where we move past the Conley-Gibson exercise in could we imagine something, and we actually look at what's alleged here. Twombly was a conspiracy case. All a conspiracy is is a particular type of agreement. It's an agreement with an unlawful objective. A partnership is an agreement also. As in Twombly, here there are no facts pled which plausibly establish the existence of that partnership. That partnership is the critical, unavoidable vehicle for Ms. Glock to have an ownership interest in any of the things she's claiming. And it's perfectly clear from reading the complaint, and Judge Thrash is an experienced judge, and he's been around the Glock many times, and he looked at this, and he understood completely. The partnership is nothing but a euphemism for the marriage. It is nothing but a vehicle for her to domesticate a divorce here under the guise of treble damages. Judge Thrash ruled in favor of the defendants on 8A, on 9B, on standing, and on foreign injury. We have raised three additional independent grounds under which this court could affirm statute of limitations, proximate cause, and private securities litigation reform act. I want to make sure I answer any question the court has, but I do not want to take up the court's time unnecessarily. We appreciate that, Mr. Floyd, and we have no further questions. Thank you very much. Have a good day. Mr. Smith, you save five minutes for rebuttal. Judge, the analysis that we just went through ignores the concept of veil piercing. If corporate entities are disregarded, if corporate entities are altered egos, how can the injury not be direct to Mrs. Glock? Because your complaint is that this Austrian entity was looted, causing an injury to a shareholder in Austria. I don't see how veil piercing helps you in the least. We believe it does, Judge, in this way. You've got a parent company in Austria. You've got a sub in Georgia. We have alleged that those entities are altered egos of Gaston Glock. Because they are altered egos of Gaston Glock, and because it is alleged that Gaston Glock committed wrongs, he can't commit wrongs against himself. He cannot target and direct himself. And like the Eleventh Circuit said in Mays, even after there was an investment in a separate company, and the defendant argued that that was no longer a direct injury, the court— Yeah, but so Gaston Glock, who uses entities, some of which are abroad, to injure someone in Austria. No, sir. To injure someone here, there is— I thought the plaintiff lived in Austria. She's the plaintiff, right? Yes, Your Honor, just like Buscanin lived in Chile. And is a citizen of Chile, and there was no allegation that Buscanin was ever here. In fact, the account that it was alleged to have been taken from was a trust account. We didn't hear anything about derivative claims in the Second Circuit case. It was a trust account from which money was taken. And in this instance, Judge, we have contended— That was tangible property located in New York, wasn't it? That is correct, Judge. It was physical property. Quite a bit different from this case, doesn't it? I would say that it's analogous to this case, Judge, because in our complaint, we allege money was taken from Glock, Inc., the subsidiary in Schmyrna, Georgia, from bank accounts that were located here, from, you know, monies that were here forming other entities and transferring it through those bank accounts. And in particular, one of the criticisms that we've obviously received is— There's no ownership by Ms. Glock in any of that property. That's the difference, isn't it? Well, I would submit this, Your Honor, that because we allege veil-piercing of that entity and because we allege that those entities are alter egos of Gastone Glock, no derivative action could be held. So even if we were merely talking about a domestic entity— Let's take the Austrian entity out for one second for the purposes of veil-piercing. Assume we're only talking about Glock, Inc. in Schmyrna, Georgia. I would submit to the court that Mrs. Glock could not bring a derivative action on behalf of Glock, Inc. in Schmyrna, Georgia, because she contends that Glock, Inc. is an alter ego of Gastone. And because she does not allege that Gastone directed and targeted his acts at himself, it would not be proper for her to bring a derivative action under Bivens because she's not alleging that it was targeted at the entity. So therefore, even if this was wholly something taking place in Schmyrna, Georgia, even if this was just Mrs. Glock with her claim here, it would be appropriately under Georgia law and under Bivens and under Stooksbury and under Mays, we believe an appropriate direct claim by Mrs. Glock against Gastone Glock based on allegations of RICO violations at an entity that she has pled plausibly should be disregarded because it is his alter ego. And that, we would submit, would be the correct analysis if it were simply here. So if we were having this discussion and the discussion were simply, Mrs. Glock doesn't have standing, her claim is not sufficiently direct to bring a claim herself. She needs to bring it on behalf of Glock, Inc. We'd submit to the court that she can't do that if Glock, Inc. is an alter ego of the defendant, just like in Stooksbury. And as this court reasoned in Mays, even when there was an investment and transfer of the partnership interest into a corporation,  what the allegations were and determined that, in that instance, the target of the RICO conduct was always the individual plaintiffs, and despite the fact that the value had been moved into a corporation, could still have standing to bring it. Thank you, Mr. Smith. We have your case. The last case for today is Clayton County v. Federal Aviation.